**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
EASTERN DIVISION**

**GREGORY BROOKS**                                        **PLAINTIFF**

**vs.**                                        **CAUSE NO. 1:12-cv-00190-SA-DAS**

**CITY OF WEST POINT, MISSISSIPPI;
JIMMY BIRCHFIELD; and
WILLIAM SPRADLING**                                        **DEFENDANTS**
_____

**PLAINTIFF'S MEMORANDUM IN SUPPORT OF HIS RESPONSE TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**
_____

Comes now, Plaintiff, by and through the undersigned counsel of record and files this

memorandum in support of his response to Defendants' motion for summary judgment, and

states as follows:

## I.  FACTS

**A.        Defendants' presentation of facts:**

At the outset, Plaintiff takes issue with and is compelled to respond directly to

Defendants' alleged factual summary beginning at page 2 of their memorandum of authorities.

To say that the presentation of facts is slanted in favor of the Defense would be an

understatement.[1]  For example, Defendants' very first sentence states that Plaintiff "has had

anger issues" relating to his PTSD since 2003.[2]  Defendants cite Mr. Brooks' deposition to

support this assertion.  At his deposition Mr. Brooks discussed his PTSD diagnosis, the event

which led to his PTSD, and the depression and feelings of frustration with the change his PTSD

_____

[1] There are a number of blatant misrepresentations throughout the Defense memorandum.  Plaintiff urges the Court to look to the exhibits to find whether factual representations made by the Defense are actually supported by evidence, especially with regards to Defense claims that Plaintiff "admitted" things.
[2] Doc. #58, p. 2.

made in him.[3]  Discussing when he first returned from Iraq in 2003, Defense counsel asked Mr.

Brooks, "Did you have any issues with anger that stemmed from the incident or the PTSD?"[4]

Plaintiff responded, "Somewhat."[5]  The questioning continued:

> Q    Tell me about that.
>
> A    I mean, you know, I was angry because I
>       was feeling the way I was feeling.  You know, I
>       was -- you know, just wasn't myself.
>
> Q    Did it affect your personal life?
>
> A    Yes.
>
> Q    How?
>
> A    I mean, I was depressed, you know.
>
> Q    Did it cause you any problems with self
>       control or lashing out?
>
> A    No more than, you know, I mean, with my
>       kids and all, when they did just the little smallest
>       thing, you know, by being in the military, like
>       their [shoes] wasn't stacked properly, you know, I
>       would get on them about their shoes and stuff just
>       for the little things just because of what I had
>       experienced over there.  So I know I needed help,
>       you know, but I just didn't, you know -- you know, I
>       would get angry at them for just the smallest thing
>       and I knowed I needed help after that, so that is
>       the reason why I went to see Captain Hubbard.
>
> Q    Did you ever have any altercations with
>       anybody, heated words or physical altercations with
>       anybody?
>
> A    Not that I can recall.[6]

---

[3] See Exhibit "A," Deposition of Gregory Brooks, pp. 30-35
[4] Exhibit "A," p. 34, ll. 10-11.
[5] Exhibit "A," p. 34, l. 12.
[6] Exhibit "A," pp. 30-35.  It is important to note that these questions were pertaining to the time period when
Plaintiff returned from Iraq in 2004 and before his PTSD diagnosis and treatment.

This discussion of Plaintiff's realization that he needed to seek the treatment which ultimately led to his being diagnosed with PTSD is what is summed up by Defendants as "Plaintiff *has had anger issues* . . . since his deployment to Iraq in 2003."[7]

Defendants go on to say that Plaintiff's PTSD has caused him problems with "paranoia, insomnia, depression, jumpiness, nightmares, anxiety, and general troubles with hostility and lashing out."[8]  In addition to the "pre-diagnosis" discussion quoted above, Defendants rely upon the following exchange to support their assertion:

> Q     The inability to sleep.  Do you have
>        trouble sleeping?
>
> A     Yes.
>
> Q     Is that part of the PTSD?
>
> A     It has -- yes.  (Witness nods head.)
>
> Q     It is?
>
> A     It is part of what happened to me with
>        the West Point Police Department.  It got worse.  I
>        had problems sleeping before that, but now -- it
>        even got worse now.
>
> Q     Have you had problems with paranoia?
>
> A     Probably so.
>
> Q     Do you know what that means?  It's
>        like –
>
> A     Yeah.
>
> Q     -- feeling like people are out to get you
>        or conspiring against you?
>
> A     Uh, I can't -- I don't remember.  I mean,
>        I probably have had a problem with that after coming

---

[7] Doc. #58, p. 2(Emphasis added).
[8] Doc. #58, p. 2.

> back from Iraq and, you know -- you know, being in
> enemy territory, you think somebody is out to get
> you.
>
> Q   Since Iraq, have you had trouble with
>     being frustrated or agitated or hostile?[9]
>
> A   At times.
>
> Q   Tell me about that.
>
> A   I really can't remember.  At certain
>     times.  I mean, it just have happened over times.[10]

The examples provided by Defendants to support their assertions are presented in an even more skewed manner.[11]  Defendants state that Plaintiff's co-worker "*made a comment* about Plaintiff's son being a soccer player instead of a football player," and that "Plaintiff testified that he 'went off' on the co-worker and called him a 'faggot,' and that the incident resulted in an intervention by a supervisor."[12]  Defendants fail to mention that the "comment" the co-worker made about Mr. Brooks' son was calling Mr. Brooks' young son a "faggot" for playing soccer.  Mr. Brooks further discussed the incident:

> Q   Who was that coworker and what happened
>     there?
>
> A   Uh, Ed Lawler.  He was making jokes
>     about, you know, people playing soccer being faggots
>     and stuff like that, and I told him -- you know,
>     going off, I told him he was a faggot, and the --
>     and the supervisor intervened.  And, you know, it
>     wasn't much to it, you know, but it was upsetting
>     that he would say something like that knowing that
>     my son played soccer and him and I are co-workers.

---

[9] Mr. Brooks' deposition was taken on August 15, 2013.  This question is literally asking him if sometime in the last 10 years, he has had trouble with being frustrated, agitated or hostile.  It is hard to imagine any human who could answer that question truthfully in the negative.

[10] Exhibit "A," pp. 48-49.

[11] Doc. #58, p. 2, n.2.

[12] Doc. #58, p. 2, n.2(Emphasis added).

Q    Did it get close to physical?

A    No.

Q    Well, how did the supervisor intervene?

A    He just said, "Hey, that's enough of
     that, y'all just cut it out, don't joke like that."[13]

The questioning continued:

Q    Did you raise your voice at the coworker?

A    I don't remember raising my voice.

Q    Okay.  So when you said "went off" –

A    Yeah.

Q    -- you mean that you just calmly told him
     that he was a F word?

A    Yeah, a faggot.  I said it.  I told him
     he was a faggot and –

Q    That's what you meant by went off?

A    Yes.  That's just a figure of speech.
     You know, when somebody says, "I went off on them,"
     you know.

Q    Yeah, I'm familiar with it, but my
     thinking is, you know, when I hear the term I went
     off on somebody, it's more than I just said one
     thing to them.  Usually, you know, me, if I go off
     on somebody, it's going to take a minute.  You know
     what I mean?

A    Yeah.

Q    So I guess my question is, when you say
     you went off on him, was there a little more to it
     than just calmly telling him –

A    That's it.

_____

[13] Exhibit "A," pp. 179-80.

Q      That's it, that's how you go off?

A      Yeah.  I mean, at times, that's the
       way -- it's best to be like that.[14]

While the Defense presents this as an example of how Mr. Brooks' PTSD has caused him to

"lash out," one can hardly imagine any man, with or without PTSD, who would not respond just

as Mr. Brooks did, or even more aggressively, in response to his young son being called a faggot.

       The second example was an incident where Mr. Brooks got into a verbal argument with

his teenage daughter when she came in after curfew and was refusing to answer her cell phone.[15]

Mrs. Brooks described the incident and described Mr. Brooks as a "mad dad" during the incident

and described herself as being angry at her daughter as well.[16]  Jaquay Brooks, Mr. Brooks'

daughter, also described the incident, stating that she, her mother and her brother were only away

from the house for "like a day" because her mother was angry at her for her behavior as well.[17]

       Finally, the Defendants accuse Mr. Brooks of "encouraging [his daughter] to fight"

another girl after a softball game. Defendants cite to a West Point police report in which the

officer appeared to be relying upon third person descriptions of what occurred.[18]  What is

omitted from Defendants' description of this event is the fact that the police report and Mr.

Brooks describe the girl Jaquay was fighting as having bullied Jaquay while she was playing

softball.[19]  Further, Mr. Brooks explained that he did not encourage his daughter to fight, but that

he had tried to defuse the situation earlier by telling the park manager about the bullying

situation, and ultimately, when the fight did result, he actually broke the girls up.[20]

---

[14] Exhibit "A," pp. 180-81.
[15] Again, an incident where any parent would be upset.
[16] Exhibit "B," Deposition of Jackuline Brooks, p. 67, ll. 19-25; p. 68-69.
[17] Exhibit "C," Deposition of Jaquay Brooks, pp. 59-60.
[18] See Doc. #57, Exhibit C.
[19] See Doc. #57, Exhibit C; and See Exhibit "A," pp. 43-44.
[20] Exhibit "A," pp. 41-45; p. 174, ll. 19-25.

While the above examples reveal the skewed presentation of facts by the Defense, the real question one must ask is, "What does any of this have to do with whether Mr. Brooks was wrongfully arrested or whether the defendants are entitled to qualified immunity?" The answer is, "Nothing." Rather, this skewed presentation of facts, all of which preceded the subject arrest, is a blatant attempt to prejudice the Court against the Plaintiff, or at the very least, an attempt to urge the Court to improperly weigh issues of credibility.

**B.      Relevant facts:**

On the morning of January 2, 2012, Mr. Brooks called 911 in reference to his sisters, Janice Brooks and Kimberly Brooks, making harassing phone calls to him and leaving harassing voicemails on his phone.[21]  Officer Jimmy Birchfield was dispatched to Mr. Brooks' home in response to this call.[22]  When Officer Birchfield arrived at Mr. Brooks' home, Mr. Brooks met Officer Birchfield in the front yard and told him about the telephone harassment and even played some of the messages for Officer Birchfield.[23]  Mr. Brooks testified that after he told Officer Birchfield about the harassment, showed him text messages and played some voice messages for him, Officer Birchfield told Mr. Brooks that he could not press charges.[24]  After being told by Officer Birchfield that he could not press charges against his sisters, Mr. Brooks told Officer Birchfield to "Get the hell out of [his] yard."[25]  While the content of the exchange of words between Officer Birchfield and Mr. Brooks is disputed, the series of events which occurred next is largely undisputed.

---

[21] Exhibit "D," Audio of Gregory Brooks 911 call.
[22] Exhibit "E," Deposition of Jimmy Birchfield, p. 20.
[23] Exhibit "A," pp. 67-69.
[24] Exhibit "A," p. 69.
[25] Exhibit "A," p. 69, ll. 22-24.  As there is a factual dispute regarding which words were actually used, Plaintiff will not censor any of this brief, but will instead use the actual words used in the evidence.

Once Officer Birchfield and Mr. Brooks were finished exchanging words, Mr. Brooks went back inside his home.[26] Officer Birchfield returned to his car and backed it out to the street.[27] Officer Birchfield called for another officer, Officer Spradling, to come to the scene.[28] While Officer Birchfield was waiting on Officer Spradling, Mrs. Brooks and Jaquay went to Officer Birchfield's car and spoke with him.[29] After speaking with Officer Birchfield, Mrs. Brooks and Jaquay went back inside their home.

Once Officer Spradling arrived at Mr. Brooks' residence, Officers Birchfield and Spradling approached Mr. Brooks' home and pounded on the front door.[30] When Mr. Brooks exited his home, through the side door that they customarily use, Officer Birchfield began to yell at Mr. Brooks that he was being arrested for disorderly conduct.[31] Officer Spradling grabbed Mr. Brooks by one arm or both arms.[32] Everyone present, except the defendants, testified that Officer Birchfield charged toward Mr. Brooks while Mr. Brooks was being held by Officer Spradling and that Mr. Brooks placed his hands up, palms out, in a defensive position to stop Officer Birchfield from running him over.[33]

Officers Birchfield and Spradling proceeded to wrap their arms around Mr. Brooks and push and pull and toss him back and forth, including hitting him against the garage door.[34] Both

---

[26] Exhibit "A," p. 74, ll. 21-23.
[27] Exhibit "E," p. 34, ll. 6-10. He testified that he was getting in a "defensive position" although there is absolutely no evidence of any reason for him to have done so.
[28] Exhibit "F," Depositions of William Spradling, p. 12, ll. 19-24. Apparently calling for a second officer on an arrest is standard West Point Police Department procedure, and the call was not made because of any perceived danger. Exhibit "F," p. 33.
[29] Exhibit "B," p. 30, ll. 16-25; p. 31. Mrs. Brooks testified that Officer Birchfield told her that Mr. Brooks couldn't press charges because Mr. Brooks' sister said Mr. Brooks called her.
[30] Exhibit "A," p. 51, ll. 5-12; Exhibit "B," p. 33, ll. 19-24. Officer Birchfield testified that he used a "police knock." Exhibit "E," p. 56-57.
[31] Exhibit "B," pp. 45-46. Mrs. Brooks recalls Mr. Brooks asking the officers, "Why are you banging on my door?"
[32] Exhibit "B," pp. 46-47; Exhibit "A," p. 80, ll. 15-21.
[33] Exhibit "B," p. 48, ll. 1-15; Exhibit "C," pp. 28-29; Exhibit "A," p. 90, ll. 16-25; p. 95, ll. 2-4.
[34] Exhibit "B," p. 50-53. Mrs. Brooks testified that no verbal commands were given by the officers, that it appeared as though they were working against each other and that it appeared they could have been just trying to assault him. Jaquay Brooks' had the same recollection. Exhibit "C," pp. 28-29.

Jaquay and Mrs. Brooks testified that they were pleading with the officers to stop.[35] Then Mrs. Brooks told Mr. Brooks to "just lay down," hoping that would stop the officers' assault.[36] Mr. Brooks then attempted to just go down to his knees, and the officers pushed him down to his hands and knees.[37] Mr. Brooks was then placed in handcuffs and escorted to Officer Spradling's car.[38]

It is undisputed that following Mr. Brooks' arrest, he was transported to the parking lot of the Clay County Jail where Mr. Brooks was picked up by an ambulance. Mr. Brooks was physically unable to exit the back of the police car, so the ambulance crew removed him and placed him on a stretcher.[39] Mr. Brooks was ultimately hospitalized for three days in order for him to be stabilized following the events described herein above. Mr. Brooks had never required hospitalization before.[40] Since his arrest he has received additional treatment for increased PTSD related symptoms, including therapy and increased medications.[41]

## II.  STANDARD OF REVIEW

"Summary judgment is proper only when the pleadings and evidence, viewed in a light most favorable to the nonmoving party, illustrate that no genuine issue of material fact exists and the movant is entitled to judgment as a matter of law."[42]  "If the 'evidence is such that a reasonable jury could return a verdict for the nonmoving party,' then there is a genuine dispute as to a material fact."[43]

---

[35] Exhibit "C," p. 32, ll. 15-16, p. 36, ll. 1-7; Exhibit "B," p. 50, ll. 18-20.
[36] Exhibit "B," pp. 50-51; Exhibit "C," p. 36.
[37] Exhibit "A," p. 97.
[38] Exhibit "A," p. 98; Exhibit "B," p. 53, ll. 22-24.
[39] Exhibit "A," p. 113, ll. 13-19. Mr. Brooks testified that he was having a panic attack, complications from asthma and his back and neck were hurting. Exhibit "A," p. 109, ll. 10-21, p. 115, ll. 4-7.
[40] Exhibit "B," p. 19, ll. 7-18.
[41] Exhibit "A," pp. 155-56, p. 182.
[42] *Payne v. Benton County*, 2012 WL 5833644 (N.D. Miss. 2012)(Citing Fed.R.Civ.P. 56(a), (c)).
[43] *Id.*(Quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

Qualified immunity presents a "two-pronged inquiry that requires the Court to first determine 'whether [the plaintiff] has adduced sufficient evidence to raise a genuine issue of material fact suggesting [the defendant]'s conduct[] violated an actual constitutional right.'"[44] "If a violation of a constitutional right is shown by the facts, the second inquiry is 'whether the defendant's actions were objectively unreasonable in light of clearly established law at the time of the conduct in question.'"[45]

### III.  ARGUMENT

### A.    First Amendment Retaliation/Fourth Amendment Unreasonable Seizure:

It is clear and undisputed that Officer Birchfield made the decision to arrest Mr. Brooks based upon the interaction between the two prior to Mr. Brooks going back into his home and Officer Birchfield returning to his car.  In the light most favorable to Mr. Brooks, that entire interaction consisted of: (1) Mr. Brooks telling Officer Birchfield about his sisters' calls and messages, (2) Officer Birchfield telling Mr. Brooks that he could not press charges, and (3) Mr. Brooks telling Officer Birchfield to "get the hell out of [his] yard" or "off [his] property."[46] Then, Mr. Brooks returned to the inside of his home and called 911 to complain about the way Officer Birchfield had handled the situation.

Officer Birchfield testified that, after Mr. Brooks told him about the calls and messages from his sisters, he explained to Mr. Brooks that he would have to come to the station to press charges and that his sister in Atlanta would not be extradited on telephone harassment charges.[47] Birchfield's story continues:

---

[44] *Id.* at *4(Quoting *Brumfield v. Hollins*, 551 F.3d 322, 326 (5th Cir. 2008)).

[45] *Id.*(Quoting *Freeman v. Gore*, 483 F.3d 404, 411 (5th Cir. 2007)).

[46] Defendants state that, "Plaintiff admits he *yelled* at Officer Birchfield to 'get the **** out of [his] yard'" Doc. #58, p. 4.  At another point Defendants say Plaintiff "screamed" this at Officer Birchfield. Doc. #58, p. 15.  This is, once again, a blatant exaggeration and misrepresentation by the Defense.  See Exhibit "A," p. 69, ll. 22-24.

[47] Exhibit "E," pp. 23-24.

So [Plaintiff] said -- he didn't like that. He thought I was being sarcastic.[48] I don't know. But he said, "Well, Birchfield," you know, "I don't like your punk ass no way." I said, "Mr. Brooks, I'm trying to explain to you this is the way it works." And he said, "you know, furthermore, just get your mother fucking [sic] ass out of my yard."

So that's when I told Mr. Brooks, I said, "Mr. Brooks, this is the only thing about this." I said, "now, you can't be cussing the police." I said, "now, at this point what you're doing is being disorderly." I said, "I'm trying to advise you on what we can do and what we can't do." And he said, "I don't like your mother fucking [sic] ass no way. Get the fuck on out of my yard." I said, "okay, Mr. Brooks, you're fixing to go to jail for disorderly conduct."[49]

The Defense states in their memorandum that after being told to calm down by Officer Birchfield, that "Plaintiff continued shouting and cursing near Officer Birchfield and in a loud, threatening, and belligerent manner."[50] This is interesting considering that the Defense cannot cite to a single piece of evidence that actually says that Mr. Brooks was shouting or being threatening in any way.[51] Officer Birchfield swore to his report at his deposition.[52] The report does not say that Mr. Brooks was loud, threatening or belligerent; it does not say that Mr. Brooks screamed or yelled; it does not say that Officer Birchfield perceived Mr. Brooks' words or conduct as a threat or an incitement to violence; it only says that Mr. Brooks used curse words toward Officer Birchfield.[53] The pages of Officer Birchfield's deposition relied upon by Defendants also offer them no help. Officer Birchfield testified that he told Mrs. Brooks about Mr. Brooks' conduct and his decision to arrest Mr. Brooks:

[D]ue to the fact where he has been told not to *curse the police* the way he did . . . that's why he's going to jail because he was told . . . the thing about it is, when you is told *not*

---

[48] It is very interesting to note that even Officer Birchfield himself thinks he came off as sarcastic in the interaction with Mr. Brooks.
[49] Exhibit "E," pp. 25-26.
[50] Doc. #58, p. 15.
[51] One can only assume that the Defense is attempting to create a circumstance which was not there in order to support their totality of the circumstances argument. Unfortunately for the Defense, Officer Birchfield's own testimony refutes their fiction.
[52] Exhibit "E," p. 18.
[53] Exhibit "G," Report of Officer Birchfield.

*to curse* and you refuse to listen to that and you go on and on and *disrespect the police* in that way, you're actually saying you want to go to jail.[54]

Officer Birchfield stated plainly that "[Mr. Brooks] was being arrested for cursing, saying, 'get your mother fucking ass off my yard. I told your punk ass.' Those words is when he was told he couldn't be cursing the police department – the police officer in that type of manner. Those are the words he was using."[55] When asked whether the disorderly conduct arrest was based upon Mr. Brooks saying cuss words to Officer Birchfield after Officer Birchfield told Mr. Brooks not to say those cuss words, Officer Birchfield responded, "That was the basis for the arrest."[56]

      1.     *Disorderly Conduct—Failure to obey*

      Mr. Brooks was arrested for disorderly conduct under Mississippi Code Annotated § 97-35-7(1)(i), which states:

> (1) Whoever, with intent to provoke a breach of the peace, or under such circumstances as may lead to a breach of the peace, or which may cause or occasion a breach of the peace, fails or refuses to promptly comply with or obey a request, command, or order of a law enforcement officer, having the authority to then and there arrest any person for a violation of the law, to . . .

> (i) Act or do or refrain from acting or doing as ordered, requested or commanded by said officer to avoid any breach of the peace at or near the place of issuance of such order, request or command, shall be guilty of disorderly conduct, which is made a misdemeanor and, upon conviction thereof, such person or persons shall be punished by a fine of not more than Five Hundred Dollars ($500.00) or imprisonment in the county jail for not more than six (6) months, or by both such fine and imprisonment.

Each possible factual basis for the arrest, that of Mr. Brooks and that of Officer Birchfield, is outlined fully above. Obviously, in order to have probable cause to initiate an arrest for disorderly conduct, an officer must have "sufficient evidence to believe that a breach of the peace [is] being threatened or a crime [is] about to be committed."[57]

---

[54] Exhibit "E," p. 29(Emphasis added).
[55] Exhibit "E," p. 62, ll. 18-23.
[56] Exhibit "E," p. 33, ll. 10-16.
[57] *Jones v. State*, 798 So. 2d 1241, 1248 (Miss. 2001).

In *Jones v. State*, the Mississippi Supreme Court overturned a conviction under the disorderly conduct statute, finding there to be insufficient probable cause.[58]  In that case, the criminal defendant, Jones, summoned a police officer, Newman, to approach Jones' truck in the parking lot of a convenience store.[59]  The following is the Mississippi Supreme Court's description of the interaction between Jones and Newman:

> In a quiet voice, Jones asked, "Why did you kill my son?", referring to the automobile wreck that claimed his son's life two years earlier. In response, Newman instructed Jones to take his family and leave the premises. Again, Jones asked about the death of his son. Deputy Newman explained that he was not even on duty at the time and again instructed Jones to leave. According to Newman, Jones responded by cursing and calling the deputy a "child killing motherfucker", whereupon Deputy Newman said, "Richard, I am going to give you one more chance. You need to drive out of here with your family. No use in starting a scene here." At this point, Jones allegedly stuck his head out of the window and began yelling profanity and accusing Newman of having a hand in his son's death.[60]

After the exchange, Newman ordered Jones to get out of the truck, telling him he was under arrest.[61]  Jones refused to exit the truck at first, causing Newman to attempt to forcibly remove Jones.[62]  Jones then flung the door of the truck open, striking Newman, exited the truck and challenged Newman to a fistfight.[63]  In addressing whether there was probable cause for Newman to have arrested Jones, the Mississippi Supreme Court stated, "Based upon a careful review of the record, this Court finds that Deputy Newman, did not have sufficient evidence to believe that a breach of the peace was being threatened or a crime was about to be committed."[64]

In *Jones*, Jones basically summoned Officer Newman to him simply to pick a fight.  Mr. Brooks summoned Officer Birchfield for a legitimate purpose, to make a complaint.  Jones used profanity in Officer Newman's face, calling him a "child killing motherfucker."  Mr. Brooks

---

[58] *Jones*, 798 So. 2d at 1248.
[59] *Id.* at 1246.
[60] *Id.*
[61] *Id.*
[62] *Id.*
[63] *Id.*
[64] *Id.* at 1248.

simply told Officer Birchfield to get the hell off his property.[65]  Just as there was not probable

cause for Officer Newman to believe that a breach of the peace was about to occur or that a

crime was about to be committed, there too was no probable cause for Officer Birchfield to

believe that there was about to be a breach of the peace or that a crime was about to be

committed.

In *Odem v. State*,[66] the Mississippi Court of Appeals upheld the conviction of a man who

created a disturbance at a sheriff's department.  Odem had loaned his vehicle to a friend.

Odem's friend was arrested on drug charges, and Odem's vehicle was impounded.  When Odem

went to the Madison County Sheriff's Department to claim his vehicle, he was told to return with

proof of ownership the following Monday.  When Odem returned on Monday, he was told that

he would have to go to the impound lot to retrieve papers from the vehicle.  His arresting officer

testified as follows:

> He became a little bit louder and a little more irate. He said, I have already been there. I
> tried to get the proper paperwork for this vehicle. They wouldn't let me get the
> paperwork. This is a bunch of .... This is a shit. He said, I've already been there to get this
> paperwork. They refused to let me get the paperwork out of my own vehicle. I said, well,
> I'll call. He said this is just a bunch of MF shit. I've already been up there one time to get
> the paperwork. He said, do you mean that I've got to go back up there, get the paperwork,
> bring it back to your office, show you the paperwork and then go back up there to get my
> vehicle? I said, yes, that's exactly what you'll need to do.
>
> He said this is a bunch of F'ing shit that it seems like that I'm having to run back and
> forth. This is a bunch of sick shit that seemed like I am just harassed become of the
> paperwork or the vehicle. I said, no, we cannot release the vehicle without the proper
> paperwork.
>
> And he became more agitated, and he started shouting.... And with all the swear words
> and loudness, he kept getting louder and louder, and I told him, I said, there's no need of
> this language. I will call Mr. Cannon [the owner of the towing company where the

---

[65] Even taking Officer Birchfield's version as true, which is not at all required the summary judgment standard, Mr.
Brooks was still telling Officer Birchfield to leave by telling Officer Birchfield to get his motherfucking ass off Mr.
Brooks' property.  While the words might have been different, the message was the same.
[66] 881 So. 2d 940 (Miss. Ct. App. 2004).

vehicle was located]. You can get your paperwork. But the next time that you utter cuss words like you're doing now, I'm going to place you under arrest for disorderly conduct.

He said, this is just a bunch of sick shit that I should not have to go through this, and I'm tired of it. And it seems like all you MF's are harassing us.[67]

Odem was then informed that he was under arrest for disorderly conduct.

The *Odem* Court cited several United States Supreme Court cases striking down arrests and convictions which stifled constitutionally protected speech.[68] The Court of Appeals drew a distinction between those cases and Odem's case, stating, "Here, unlike the cases cited, the confrontation occurred not out in public but at the sheriff's department."[69] The Court continued:

> [Officers] may not simply take offense to words that are expressed at them in a tense situation. We believe it is important that Lieutenant Marlett neither initiated *nor had an opportunity to walk away* from Odem's words and combative conduct. Odem became agitated and began shouting profanities when Lieutenant Marlett told him about the protocol he would have to follow to retrieve his vehicle from the impound lot. Odem expressed his displeasure with the inconvenience. Odem did not stop with simply expressing his displeasure. He was combative, and he created a stalemate that arose to the level of "fighting words" that were likely to inflict injury or incite an immediate breach of the peace. Indeed, Odem indicated no intent to back down until Lieutenant Marlett gave him his vehicle without following the proper procedure.[70]

Unlike the situation in *Odem*, the incident with Mr. Brooks and Officer Birchfield occurred out in public, not inside the police station or sheriffs' department. Further, Officer Birchfield admitted that he could have walked away from the situation with Mr. Brooks. When asked whether he could have left after the verbal altercation with Mr. Brooks, Officer Birchfield stated that he "wasn't going to leave,"[71] but admitted that he could have left and no one was impeding him from leaving the scene at any point.[72] While the wording used by Mr. Brooks is disputed, it

---

[67] *Odem*, 881 So. 2d at 943.
[68] *Id.* at 947-48.
[69] *Id.* at 948.
[70] *Id.* at 948-49(Emphasis added).
[71] Exhibit "E," p. 34, ll. 12-14.
[72] Exhibit "E," p. 34, ll. 20-21, p. 36, ll. 14-24.

is undisputed that Mr. Brooks told Officer Birchfield to leave.  Officer Birchfield made the choice to stay.

>   2.   *First Amendment protection of verbal challenges to police action was a clearly established constitutional right at the time of Mr. Brooks' arrest:*

In *City of Houston, Texas v. Hill*, the United States Supreme Court stated, "the First Amendment protects a significant amount of verbal criticism and challenge directed at police officers."[73]  The Court continued stating, "'Speech is often provocative and challenging.... [But it] is nevertheless protected against censorship or punishment, unless shown likely to produce a clear and present danger of a serious substantive evil that rises far above public inconvenience, annoyance, or unrest.'"[74]  *Hill* dealt with a city ordinance which made it illegal to "oppose, molest, abuse or interrupt any policeman in the execution of his duty."[75]  Holding that the Constitution does not allow speech, in whatever manner, which merely interrupts an officer to be made a crime, the Court invalidated the Houston ordinance.[76]  Rather, the Court stated, "The freedom of individuals verbally to oppose or challenge police action without thereby risking arrest is one of the principal characteristics by which we distinguish a free nation from a police state."[77]  The *Hill* Court summed up its opinion as follows:

>   Today's decision reflects the constitutional requirement that, in the face of verbal challenges to police action, officers and municipalities must respond with restraint.  We are mindful that the preservation of liberty depends in part upon the maintenance of social order.  But the First Amendment recognizes, wisely we think, that a certain amount of expressive disorder not only is inevitable in a society committed to individual freedom, but must itself be protected if that freedom would survive.[78]

---

[73] 482 U.S. 451, 462, 107 S.Ct. 2502, 96 L.Ed.2d 398 (1987).
[74] *Hill*, 482 U.S. at 462(Quoting *Terminiello v. Chicago*, 337 U.S. 1, 4, 69 S.Ct. 894, 895, 93 L.Ed. 1131 (1949)).
[75] *Id.* at 461.  The *Hill* case originated as a declaratory action in which the plaintiff sought to have the ordinance invalidated as facially overbroad.
[76] *Id.* at 462.
[77] *Id.* at 462-63.
[78] *Id.* at 472.

3. *Officer Birchfield's actions were objectively unreasonable:*

In *Odem*, the Mississippi Court of Appeals noted with approval language from a concurring opinion in *Lewis v. City of New Orleans*, [79] in which Justice Powell stated, "a properly trained officer may reasonably be expected to exercise a higher degree of restraint than the average citizen, and thus be less likely to respond belligerently to fighting words."[80] This suggests that the "fighting words" exception recognized in *Chaplinsky*[81] "might require a narrower application in cases involving words addressed to a police officer."[82]

The principles outlined above were recently applied by Judge Mills in the United States District Court for the Northern District of Mississippi in the case of *Haynes v. Ramirez, et al.*[83] In that case, Steven Haynes voiced his disapproval to the ongoing arrest of his cousin by several officers, including Vincent Ramirez.[84] Haynes was standing on his porch, and after voicing his disapproval by saying loudly to the police officers, "That's all you want to do!" Ramirez told Haynes to stop "run[ning] [his] mouth" and to keep [his] ass in the house."[85] Haynes refused to go inside his home and instead informed Ramirez repeatedly that he was on "[his] porch" which is "private property."[86] Ramirez arrested Haynes for disorderly conduct—failure to obey.[87]

Citing *Odem*, Judge Mills stated that the threshold determination for probable cause under the disorderly conduct statute is whether "there was sufficient evidence to believe that a breach of the peace was being threatened or a crime was about to be committed," and that "language and . . . physical acts must be examined to determine whether [the plaintiff] had an

---

[79] 415 U.S. 130, 94 S.Ct. 970, 39 L.Ed. 2d 214 (1974).
[80] *Odem*, 881 So. 2d at 948(Quoting *Lewis*, 415 U.S. at 135 (Powell, J. concurring)).
[81] *Chaplinsky v.State of New Hampshire*, 315 U.S. 568, 62 S.Ct. 766, 86 L.Ed. 1031 (1942).
[82] *Hill*, 482 U.S. at 462 (Quoting *Lewis*, 415 U.S. at 135 (Powell, J. concurring)).
[83] See Exhibit "H," *Haynes v. Ramirez, et al.* Order on summary judgment.
[84] Exhibit "H," p. 1. The arrest was taking place on the street in front of Haynes' home.
[85] Exhibit "H," p. 2.
[86] Exhibit "H," p. 2-3.
[87] Exhibit "H," p. 6.

intent to breach the peace or whether he did in fact breach the peace."[88]  Even though Haynes

was loudly protesting police action in the presence of "five civilian bystanders" the Court found

that there was no evidence that Haynes was "attempting to incite any action, nor that any would

be taken if such was his intent."[89]  Judge Mills' analysis continued:

> Even if the language bore any likelihood whatsoever to lead to a breach of the peace, it is clear that the breach of the peace would not have been *immediate*, which is a necessary element of the *Chaplinsky* fighting words doctrine.  Therefore, Ramirez did not have the probable cause necessary to seize the plaintiff and effectuate his arrest for disorderly conduct.

> "Law enforcement officers must attempt to calm situations instead of escalate them." *Odem*, 881 So. 2d at 940.  "Courts need to be alert to arrests that are prompted by constitutionally protected speech, even when the arrestee's words are directed at a police officer performing official tasks." *Mesa v. Prejean*, 543 F.3d 264, 273 (5th Cir. 2008).  "[A] properly trained officer may reasonably be expected to exercise a higher degree of restraint than the average citizen, and thus be less likely to respond belligerently to fighting words." *Lewis v. City of New Orleans*, 415 U.S. 130, 135 (1974)(Powell, J. concurring).[90]

Judge Mills held that Ramirez had acted objectively unreasonably.[91]

It is undisputed that Mr. Brooks and Officer Birchfield were the only two people present

at the time of their verbal conflict.  While Defendants make the conclusory argument that Mr.

Brooks "acted in a manner predicted to 'cause or occasion a breach of the peace,'"[92] they never

say, nor has any Defendant in this case ever said, what that breach of the peace supposedly

would be.[93]  That is because there was not an imminent breach of the peace.[94]  It is obvious from

---

[88] Exhibit "H," p. 6-7(Quoting *Odem*, 881 So. 2d at 946).
[89] Exhibit "H," p. 7.  Even though the Court recognizes that Haynes might have been trying to incite more people to challenge the police, the fact that he was not accomplishing this goal supports his argument that there was no probable cause for his arrest.
[90] Exhibit "H," p. 8(Emphasis in original).
[91] Exhibit "H," p. 8.
[92] Doc. #58, p. 15.
[93] It is telling that even Officer Birchfield's charging affidavit, which he testified contained the basis for his arrest, makes absolutely no mention of an imminent breach of the peace, but only states that Mr. Brooks told him to get his punk ass off his property and to get his motherfucking ass off his land. See Exhibit I.
[94] By way of contrast, see *Smith v. City of Picayune*, 701 So. 2d 1101 (Miss. 1997), where the Court upheld Smith's disorderly conduct conviction where he refused to comply with the order of a police officer to leave the scene of a fight which was occurring on the Smith's property.  Smith was holding a baseball bat, which, for obvious reasons,

the incident report, the affidavit and Officer Birchfield's testimony that Officer Birchfield simply took offense to Mr. Brooks verbally challenging him.[95]  As cited above, Officer Birchfield's deposition is replete with statements indicating, "You just can't be cursing the police like that." Officer Birchfield is wrong.  He was told to leave, and he stayed.  Mr. Brooks returned inside his home, Officer Birchfield went to his car, and instead of driving away, Officer Birchfield escalated the situation.  Just as Judge Mills held that Officer Ramirez' actions were objectively unreasonable, so too should this Court hold that Officer Birchfield's actions were objectively unreasonable.[96]

While there is an obvious lack of probable cause for Mr. Brooks' arrest, Plaintiff will note that even if the Court finds there was probable cause for the arrest, Mr. Brooks' First Amendment claim may continue.  In the context of a qualified immunity inquiry, the right of a plaintiff to be free from malicious retaliation by public officials for the exercise of First Amendment freedoms is clearly established "even if the official in question has available a legitimate alternative justification, e.g., probable cause for taking the action."[97]  It is obvious that Officer Birchfield's arrest of Mr. Brooks was in retaliation for the words Mr. Brooks used.

   4.    *Resisting arrest:*

Though the Defense expert, Chief Horton, opines that Mr. Brooks resisted arrest by walking back into his house after the verbal altercation with Officer Birchfield, the record does

---

indicated that the already volatile situation could escalate.  The police officer in *Smith* gave his order to avoid further breach of the peace.

[95] In the audio where Officer Birchfield calls for Officer Spradling, he states that Mr. Brooks is "being very disorderly," and that he is "fixing to go to jail." See Exhibit, "J," Audio of Officer Birchfield; Exhibit "E," pp. 36-37.  It is telling that Officer Birchfield does not say that there is anything to be prevented, e.g. a breach of the peace or an imminent crime, by arresting Mr. Brooks.  Officer Birchfield's statement makes it obvious that he just did not like the way Mr. Brooks spoke to him, and because of that, Mr. Brooks was "fixing to go to jail."  Officer Birchfield was not preventing a breach of the peace or a crime; he was *punishing* Mr. Brooks.

[96] Even viewing all of Officer Birchfield's testimony as true, the Court must come to this conclusion.

[97] *Brendle v. City of Houston, Miss.*, 177 F.Supp. 2d 553, 560 (N.D. Miss. 2001)(Quoting *Keith v. Schuh*, 1997 WL 457487 at *12-13 (N.D. Miss. 1997)).

not support that. First, it is Mr. Brooks' position that he was never told by Officer Birchfield that he was under arrest prior to returning to his house. Regardless, it is clear that Officer Birchfield never actually attempted to place Mr. Brooks under arrest. Rather, Officer Birchfield went to his car to call for Officer Spradling.[98] The only time Officer Birchfield actually attempted to place Mr. Brooks under arrest was after Officer Spradling arrived.[99]

Regardless, and again even accepting Officer Birchfield's testimony as the truth, the arrest, as shown above, was unlawful. "It is fundamental that a person has a right to use reasonable force to resist an unlawful arrest."[100] "If an attempted arrest is unlawful, the party sought to be arrested may use such reasonable force as is necessary to effect his escape, but no more," even if reasonable resistance results in an assault and battery against the arresting officer.[101] Certainly turning and walking away back into one's own home is a reasonable means to resist an unlawful arrest.[102]

The other alleged bases for the resisting arrest charge also fail to exceed reasonableness. Plaintiff pulled away from Officer Spradling and put his hands up to stop Officer Birchfield from tackling him. Again, even if we take Officer Birchfield's version as true, a simple shove to try to free oneself from an unlawful arrest is reasonable. There is no evidence that Mr. Brooks ever did anything unreasonable in resisting his unlawful arrest.

　　　　5.　　　*Assault on a police officer:*

---

[98] This entire sequence is very unusual. If Officer Birchfield was actually placing Mr. Brooks under arrest during the verbal altercation, then why would he not just place him under arrest? From what we *know* happened, it looks much more like Officer Birchfield got in his car, started to leave, but then stewed about the words that Mr. Brooks said to him and then made the decision to arrest him.

[99] The Defense attempts to make an issue of Mr. Brooks' exiting his home through the side door. The Brooks family testified that this is the door they use and that they did not open the front door because they never use it and keep it deadbolted. Exhibit "B," p.36, ll. 6-9.

[100] *Boyd v. State*, 406 So. 2d 824, 826 (Miss. 1981).

[101] *Id.* at 826-27(Quoting 6 Am. Jur.2d Assault and Battery s 79, p. 71-72 (2nd ed.1963)).

[102] Of course, the Defense "colorfully" describes it this way: "Plaintiff admits he ignored Officer Birchfield's order to submit to arrest and instead *stormed* inside the house." Doc. #58, p. 21(Emphasis added). Yet another exaggerated misrepresentation of fact.

Without belaboring the point, Mr. Brooks, Mrs. Brooks and Jaquay Brooks all testified that Officer Birchfield charged angrily at Mr. Brooks and that Mr. Brooks put his hands up in self-defense. At the very least, there is a factual dispute here. But again, as stated above, even accepting the Defendants' statements as true, a simple shove to the chest would be reasonable resistance to an unlawful arrest.

## B. Excessive Force:

"To establish the use of excessive force in violation of the Constitution, a plaintiff must prove: (1) injury, (2) which resulted directly and only from a use of force that was clearly excessive, and (3) the excessiveness of which was clearly unreasonable."[103]

There is a pure factual dispute regarding the use of force. Mr. Brooks, Mrs. Brooks and Jaquay Brooks all testified that Officer Spradling grabbed Mr. Brooks without giving any verbal command. They further testified that Officer Birchfield charged angrily at Mr. Brooks, causing Mr. Brooks to put his hands up in self-defense. They finally all testified that Mr. Brooks was pulled, pushed and tossed back and forth and hit against the garage door.[104] The Defendants of course argue that this was the minimum level of force necessary to arrest Mr. Brooks because they allege he was physically resisting. Plaintiff argues that Mr. Brooks was never given an opportunity to submit to the arrest before the officers began to physically handle him. He was never told by either officer to turn around and put his hands behind his back or to lay down. It is noted in Mr. Brooks testimony, as well as his post-arrest hospital records, that he suffered injuries to his neck and back, and he received treatment for those injuries.[105]

---

[103] *Elizondo v. Green*, 671 F.3d 506, 510 (5th Cir.2012) cert. denied, 133 S.Ct. 409, (U.S.2012)(Quoting *Collier v. Montgomery*, 569 F.3d 214, 218 (5th Cir.2009)).
[104] Exhibit "B," p. 50-53; Exhibit "C," pp. 28-29.
[105] Exhibit "K," medical record excerpts.

### C. Remaining claims:

In the interest of time and judicial economy, Plaintiff concedes the following issues insofar as they do not affect his First and Fourth Amendment Claims, discussed above, against Officer Jimmy Birchfield individually and Officer William Spradling individually: (1) Plaintiff's Fourteenth Amendment claims; (2) Plaintiff's official capacity claims against West Point and Officers Birchfield and Spradling; (3) Plaintiff's State law claims. Plaintiff does not concede his claims against the individual defendants, Birchfield and Spradling, for violations of his rights under the First and Fourth Amendments as discussed and briefed herein above.

### IV. CONCLUSION

When viewing the facts in the light most favorable to the Plaintiff, it is obvious that Mr. Brooks' arrest was without probable cause and in retaliation for his exercise of his well-established right to verbally challenge a police officer. Even when viewing Officer Birchfield's testimony as true, this is obvious. This Court should hold that Officer Birchfield's actions were objectively unreasonable. Further, Plaintiff suffered injury as a result of the objectively unreasonable and excessive force used by Officers Spradling and Birchfield during his arrest. Defendants' Motion for Summary Judgment should be denied.

Respectfully submitted this the 14th day of March, 2014.


BY:  s/ Brandon Flechas
      BRANDON FLECHAS (MSB#102283)
      PHILIP A. STROUD (MSB# 99401)
      Attorneys for Plaintiff


**OF COUNSEL:**

**The Stroud Law Firm, P.C.**
**5779 Getwell Road, Suite C-1**
**Southaven, MS 38672**

**Tel. (662)536-5656**
**Fax (662)536-5657**

## CERTIFICATE OF SERVICE

I do hereby certify that I have on this 14th day of March, 2014, electronically filed the

foregoing with the Clerk of the Court using the ECF system which sent notification of such filing

to the following:

Lem E. Montgomery, III
Orlando R. Richmond, Sr.
Butler, Snow, O'Mara, Stevens &
Cannada, PLLC
lem.montgomery@butlersnow.com
orlando.richmond@butlersnow.com

Attorney for Defendants

And I hereby certify that I have mailed by United States Postal Service the document to

the following non-ECF participants:  None.

s/ Brandon Flechas